**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Donald J. ANGELINI, Dominic Cortina, Joseph Spadavecchio, Salvatore J. Molose, Nick Camillo, John La Placa and Frank Aureli, Defendants-Appellees.**

**No. 77–1152.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 16, 1977.

Decided Nov. 7, 1977.

Rehearing Denied Nov. 30, 1977.

Peter F. Vaira, Atty. in Charge, Chicago Strike Force (DOJ), Washington, D. C., Stephen H. Pugh, Jr., Chicago, Ill., Gregory Ward, Special Attys., (DOJ), Washington, D. C., Charles P. Kocoras, Acting U. S. Atty., Chicago, Ill., Sidney M. Glazer, Paul J. Brysh, U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Carol R. Thigpen, Edward J. Calihan, Melvyn L. Segal, Raymond J. Smith, John C. Tucker, Gerald M. Werksman, Herbert Barsy, Chicago, Ill., for defendants-appellees.

Before PELL, BAUER and WOOD, Circuit Judges.

PELL, Circuit Judge.

This case involves Government interceptions of wire communications without achieving strict compliance with the federal statutes governing such interceptions,[1] with the court being called upon to determine whether to apply the severe remedy of suppressing the resulting tapes and derivative evidence. The district court ordered suppression, and the Government appealed, pursuant to 18 U.S.C. § 2518(10)(b).

The pertinent facts are not complicated. During the period between November 1974 and February 1975, the Government obtained three separate wiretap orders as part of its investigation into illegal gambling operations. The adequacy of these orders and the propriety of the procedures used to obtain them are not in issue here, nor is there any question before us about the scope or manner of the actual interceptions. The product of these interceptions, pursuant to 18 U.S.C. § 2518(8)(a),[2] was a substantial quantity of tape recordings of the intercepted telephone calls. Although § 2518(8)(a) calls for such recordings to be sealed by the district judge "immediately" upon the expiration of the authorization order, this was not done here. Instead, the tapes resulting from the three authorization orders were sealed 9, 38, and 26 days after the respective orders expired.[3]

The Government explained the delay in sealing as follows. After the tapes were made, the Federal Bureau of Investigation

---

1. The provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, are summarized in *United States v. Lawson,* 545 F.2d 557 (7th Cir. 1975), *cert. denied,* 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337 (1976), and there is no reason to repeat that task here. Statutory provisions of particular relevance to this case will, of course, be discussed *infra.*

2. Section 2518(8)(a) provides, in pertinent part:
   The contents of any wire or oral communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device. The recording of the contents . . . shall be done in such way as will protect the recording from editing or other alterations. Immediately upon the expiration of the peri-

od of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. . . . The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire or oral communication or evidence derived therefrom under subsection (3) of section 2517.

3. We find it unnecessary to decide whether the orders expired at the terminal dates indicated on their faces or on the dates on which interception under the orders was actually terminated (by which count the delays in sealing would be 14, 43, and 44 days respectively), for the legal issues presented are the same either way.

(FBI) made duplicate tapes, and the duplicate tapes were given to a full-time group of five or six typists for transcription. The originals were retained in secure storage, to which only the FBI special agent in charge had access. Because of the quantity of the tapes, the volume of intercepted calls on each, and the difficulty of transcribing sometimes garbled or inaudible recordings, it took several days to transcribe each tape. When transcripts were typed, they were returned to the special agent in charge with the tape copies. Where the typists were unable to understand the content of certain conversations, an agent attempted to do so with the duplicates, failing which reference to the original tapes was had. Reference to the originals was had between 17 and 25 times. The Government argued to the district court and argues here that it operated in perfect good faith to facilitate use of the tapes as legal evidence. Absent some harm to the defendants, the Government insists, the tapes should not be suppressed.

In an oral opinion, the district court judge stated:

> Now, I find as a fact that there was no tampering [with the tapes] whatsoever. I find as a fact that the Federal Bureau of Investigation and the attorneys for the Department of Justice acted in the best of faith and with the best of motives and I further find that none of them attempted to circumvent the law in any way and I further find that they believed that they were not circumventing the law and I think they still believe it, and they may be right; but it is my obligation to interpret and apply the law as I see it.

The district judge declined to enter a finding that there had been no inadvertent alterations of the tapes, reasoning that such alterations might have occurred as the tapes were used, and opining that avoiding the necessity of factual findings on the existence of such alterations was part of the reason for the immediate sealing rule. As the district judge viewed the case, the "satisfactory explanation" referred to in § 2518(8)(a) for the lack of a properly and promptly applied seal requires the Government to show that a sealing delay was "really necessary." Because the amount of the total tape transcripts which retention of the original tapes could have clarified was an "infinitesimal percentage" not likely to have much impact on the Government's need to prove at trial an ongoing gambling operation, this standard was not met. The district court judge determined that the lack of a satisfactory explanation, thus defined, required suppression without more.

In *United States v. Lawson, supra,* 545 F.2d at 564, this Court determined that the general suppression provision of Title III, 18 U.S.C. § 2518(10)(a), and particularly subsection (i) therein, governs post-interception compliance problems such as this one. *Lawson* states that the post-interception procedural requirements aim to "preserve the integrity of the intercepted conversations and to prevent any tampering or editing of the tapes or other unlawful use." *Id.* They are sufficiently important to the Congressional purposes in enacting Title III that suppression is justified in appropriate cases. Cases appropriate for suppression are identified by considering "whether the purpose which the particular procedure was designed to accomplish has been satisfied in spite of the error;" "whether the statutory requirement was deliberately ignored; and, if so, whether there was any tactical advantage to be gained thereby." *Id.*

The *Lawson* approach, which sensibly reads § 2518(8)(a) in conjunction with § 2518(10)(a), necessarily contemplates a two-step analysis in considering delayed sealing problems. If sealing was not immediately accomplished, it must be decided whether a satisfactory explanation has been offered. If not, the inquiry described above is undertaken. Although we believe this to be a close case, we find that the district court should not have suppressed the evidence in this case, both because the Government's explanation is, in the circumstances of this case, satisfactory, and because the purposes intended by Congress were fulfilled despite the delay.

■ In considering the adequacy of the Government's explanation for the sealing

delay, we point out first that this is not a case even remotely akin to *United States v. Gigante,* 538 F.2d 502 (2d Cir. 1976), where sealings were delayed for periods from over eight months to nearly thirteen months and the Government offered absolutely no explanation. Nor does this case resemble *Lawson, supra,* where the only explanation offered for a 57-day delay was the travel schedule of a single agent. Obviously, another agent could have taken charge of the sealing obligation there. Here, on the other hand, the Government was pursuing an unquestionably legitimate and important goal (transcription to facilitate the use of the tapes as evidence[4]) in the best of faith, without any intention to circumvent the statute. Moreover, for all that appears, this task was undertaken with acceptable diligence, using a team of typists working full time. The original tapes were kept secure, no one tampered with them, and they were used for clarification only sparingly, as a last resort. No argument is made that the defendants were prejudiced in any way by the delay itself. *See United States v. Diadone,* 558 F.2d 775, 780 (5th Cir. 1977).

■ On the surface, at least, it would appear that all of this would amount to a satisfactory explanation. The legislative history of Title III provides virtually no guidance as to what constitutes a "satisfactory explanation," and, even now, there is a scantling of judicial opinions dealing squarely with the question. Without purporting to adopt a definition that will be appropriate for all cases, because each case must be decided on its own facts, we think it fair to say generally that a satisfactory explanation is one in which the Government shows that it acted with dispatch and all reasonable diligence to meet the sealing requirement, respectful of the letter and spirit of Title III and mindful of the constructions it has been given in the courts.

Examination of two such constructions indicates that the explanation given here is satisfactory. In *United States v. Sklaroff,* 506 F.2d 837 (5th Cir. 1975), *cert. denied,* 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105, the court approved a two-week delay explained only by accounting for the security of the tapes for seven days and asserting that seven more days were used in preparing search warrants, where there was no showing of prejudice or tape alteration. In *United States v. Caruso,* 415 F.Supp. 847, 850–51 (S.D.N.Y.1976), *aff'd without opinion,* 553 F.2d 94 (2d Cir. 1977), the court found a satisfactory explanation for a 24-day delay in efforts to duplicate the tapes and make them ready for sealing and in discussions in the prosecutor's office about the possibility of continuing the interception. A different 42-day delay was approved in *Caruso* on the basis of confusion resulting from information that a wiretap subject had received a tipoff, the hospitalization of the prosecutor in charge, and the time it took the newly assigned prosecutor to familiarize himself with the case. We do not cite either *Sklaroff* or *Caruso* as textbook cases of satisfactory explanations, for each case, as we have said, must be judged in the context of its own facts. But we do think that the explanation given here is at least as appealing as the ones approved in those cases.

The difficulty, from the Government's point of view, and the reason we consider the present case as a close one, is that there were available alternatives which might have allowed immediate sealing and yet preserved a first quality tape for clarifying the inaudible portions. The Government might have made duplicate original tapes, or could have used filtering equipment to produce a very good copy. In the future, the Government, it appears to us, would be well advised either to use such a method or forego the benefits of clarification from the original if such a course would require late sealing. Indeed, if *Lawson, supra* at 564, in which this court chastised the Government for its "unenthusiastic approach for the 'technical' requirements" of Title III, had been decided prior to the incidents in issue

4. *See, e. g., United States v. Onori,* 535 F.2d 938, 947 (5th Cir. 1976).

here,[5] we might well take a different view of this case. But in view of the murkiness that has surrounded the phrase "satisfactory explanation," the Government agents' testimony in this case that the equipment mentioned above was not readily accessible to them, the diligence they used with that which they had, and the district court's finding that the agents acted in perfect good faith, we think the Government's explanation is, in the circumstances of the case, satisfactory.[6]

We also believe the Congressional purposes underlying the sealing requirement were met here despite the delay, for there is no substantial question raised about the integrity of the tapes. The district court's unchallenged finding was that there was "no tampering whatsoever." That conclusion goes a long way towards satisfying the *Lawson* inquiry referred to above. As we have noted, *Lawson* approved a refusal to suppress, even in the face of an inadequate explanation for a sealing delay longer than those before us here, because the integrity of the tapes was not challenged. *See also United States v. Diadone, supra; United States v. Sklaroff, supra; United States v. Falcone,* 505 F.2d 478 (3d Cir. 1974), *cert. denied,* 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975).[7]

To be sure, the district court declined to find that there had been no accidental alterations in the original tapes, being of the view that the point of the sealing rule was to avoid the need to make such findings.

Nor, consistently, did the district court find to the contrary.[8] The *Lawson* inquiry into the integrity of the late-sealed tapes, however, requires just such analysis. Defendants strenuously insist that the tapes were, after all, used, and they should not have to prove alterations. We may assume without deciding that it is not the defendants' burden to demonstrate affirmatively the existence of material alterations, *but see United States v. Diadone, supra* at 780; *United States v. Sklaroff, supra* at 840 (both cases referring to defendants' *failure to show* that tape integrity was violated), for whichever side has the burden of persuasion, the Government's proof persuades in this case.

Because of the unchallenged finding that no deliberate tampering whatsoever occurred, there is no issue here of attempting to discover cleverly made alterations. Defendants' tape recording expert suggested two possibilities of accidental alterations: accidental erasures, and accidental injury to the tapes by stretching, the later being most likely to occur when a tape slips on its reels while the tape recorder is being switched back and forth between fast forward and rewind. However, never having used the type of machine used here by the Government, the expert was in no position to say whether either of these things could have happened here. The Government's expert, on the other hand, was quite familiar with the particular machine, and testified that it was equipped with anti-stretch de-

---

5. *Lawson* was not released as a published precedential opinion until December 3, 1976. The Government, however, received a copy of this court's unpublished order (*see* Circuit Rule 35) issued on August 20, 1975, as a party to the litigation.

6. We find unpersuasive the district court's reasoning that the small number of references made to the original tapes undercut the adequacy of the explanation, for the record gives us no reason to assume that the relatively light use of the tapes could have been predicted in advance.

7. We are not unmindful that the Second Circuit in *United States v. Gigante, supra,* has read the pertinent statutes differently than we did in *Lawson.* That court has apparently chosen the position that the absence of an immediately

applied seal or a satisfactory explanation therefor requires suppression without inquiry into the satisfaction of the Congressional purposes. We see no reason, nonetheless, to question the commitment this court made in *Lawson* to determining a violation on the basis of the satisfactory nature of explanation for delay and determining whether suppression is the appropriate remedy for the violation under the standards of 18 U.S.C. § 2518(10)(a). As the Government argued before us, the *Gigante* rule inexplicably elevates the immediate sealing requirement to a more protected status than any of the other procedural requirements enacted in Title III.

8. Had it done so, of course, we would have a very different case.

vices which gently slowed to a stop the tape's progress in either a forward or backward direction before activating movement in the opposite direction. This eliminated the possibility of stretching. The expert had tried to make the machine stretch a tape without success. Moreover, even the defense witness agreed that a stretching problem would be very easy to detect. With regard to accidental erasure, we note that in many tape machines, activating the recording (and thus the erasing) mode requires the simultaneous manipulation of two or more separate controls, and there was absolutely no evidence before the district court that accidental erasure was even possible on the machine and in the use to which the tapes were put. We also point out that undisputed evidence from the Government's expert was that the activation of the erase mode on any recorder can be detected electronically. Also, of course, the very nature of an erasure is (absent tampering, as here) that a blank spot will remain quite apparent on the tape as it is played, which would, in conjunction with defense counsel's evaluation of the pertinence of a tape segment to the defense, eliminate the need to analyze huge amounts of tape.

■ What we are saying, here, in part, is that there is ample authority and mandate in the law for the district judges to refuse to admit particular tapes or portions thereof where there appears a reasonable possibility that accidental alteration may have occurred that in any way prejudices the defense. The wholly speculative possibility, however, that readily detectable alterations might somehow have crept into these tapes does not pose such a question about the tapes' integrity as to justify suppressing the lot of them. We find significant in this respect the undisputed fact that the original tapes were used very little by the Government in the process of making the transcripts.

For the reasons set out herein, the district court's suppression order is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.